**Law Office of Patrick Mause, PLLC**

Patrick W. Mause
290 North Meyer
Tucson, Arizona 85701
State Bar No. 024269
520.342.0000
520.342.0001 (Fax)
EMail:  Patrick@PMauseLaw.com

Attorney for Plaintiff Kelly Smith

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kelly Smith, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| Life Insurance Company of North America, a foreign corporation | |
| Defendant. | |

For her Complaint, Kelly Smith ("Ms. Smith" or "Plaintiff"), alleges as follows:

### PARTIES, VENUE, AND JURISDICTION:

1.      Plaintiff Kelly Smith is a resident and citizen of Pima County, Arizona, and was a resident and citizen of Pima County, Arizona at all times material to the Complaint.

2.      Plaintiff's claim is for long-term disability (LTD) benefits, the waiver of her life insurance premiums under the life insurance plan's Life Waiver Of Premium (LWOP) provision, and for other benefits to which she may be entitled and which were provided to her under her employer's ERISA-governed benefits plan (the "Plan").

1

3.     Defendant Life Insurance Company of North America, d/b/a Cigna ("LINA") is a foreign corporation that is authorized to do business in Arizona and is doing business in Arizona.

4.     The Court has jurisdiction under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*

5.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because the "breach" of the LTD plan occurred in Pima County, Arizona, and because defendant LINA may be found in Pima County, Arizona.

### THE LONG-TERM DISABILITY AND LIFE WAIVER OF PREMIUM PLANS

6.     The LTD Plan provides Ms. Smith with income replacement in the event of her disability, as defined under the Plan.

7.     The LTD Plan is fully-insured by LINA, which also administers claims for benefits under the Plan.

8.     When making decisions regarding Ms. Smith's entitlement to benefits, LINA was acting as a fiduciary under ERISA.

9.     Under the Plan, after satisfying a 180 day "elimination period" during which benefits are not payable, Ms. Smith is entitled to LTD benefits for twenty-four months if she is unable to perform the material duties of her regular occupation and is unable to earn 80% or more of her indexed pre-disability earnings.

10.     After twenty-four months of LTD benefits, Ms. Smith is entitled to benefits if she is unable to perform the material duties of any occupation for which she is, or may reasonably become qualified to perform, and is unable to earn 60% or more of her indexed pre-disability earnings.

11.     The LTD plan does not grant LINA discretion to determine entitlement to benefits.

12.     Under the LWOP (life waiver of premium) plan, LINA waives the premiums for Ms. Smith's life insurance coverage for nine months if she is unable to perform the material duties of her regular occupation or is receiving disability benefits under the LTD Plan, and thereafter waives premiums if she is unable to perform the material duties of any occupation she is, or may reasonably become qualified to perform.

13.     After nine months, the LWOP definition of disability is the functional equivalent of the LTD plan's "any occupation" definition of disability. Accordingly, if Ms. Smith is found entitled to LTD benefits under the LTD Plan's "any occupation" definition of disability she should be considered disabled under the LWOP plan's definition of disability.

14.     The LTD Plan states that a claimant whose benefits are denied may appeal that decision, but the language does not mandate the claimant file an appeal to exhaust her administrative remedies under ERISA. To the contrary, the LTD Plan states that a claimant may waive her right to appeal.

15.     Specifically, the LTD Plan states: "Whenever a claim is denied, there is a right to appeal the decision. A written request for appeal must be made to the Insurance Company within 60 days (180 days in the case of any claim for disability benefits) from the date the denial was received. If a request is not made within that time, the right to appeal will have been waived."

16.     A true and correct copy of the LTD plan is attached hereto as Exhibit 1.

**LINA'S OBLIGATIONS UNDER ITS "REGULATORY SETTLEMENT AGREEMENT"**

17.     In May 13, 2013, LINA entered into a Regulatory Settlement Agreement ("RSA") to resolve allegations of improper claims handling raised during a Targeted Market Conduct Examination Disability Income Insurance Claim Handling Practices.

18.     In the RSA, LINA agreed to "a plan of corrective action" to be implemented going forward.

19.     Under the RSA, LINA agreed to use "best practices for adjusting group LTD claims."

20.     LINA further agreed to provide its reviewing personnel "all available medical, clinical, and/or vocational evidence in the Disability Claim File… both objective and subjective, concerning impairment."

21.     LINA further agreed to gather and consider appropriate medical documentation, including medical records, medical texts and articles, and the claimant's own statements.

22.     LINA further agreed that if presented with "[v]ague statements of impairment" such as "Claimant is totally disabled," "it is appropriate to seek further clarification from the treatment provider making the vague statements."

23.     LINA further agreed to consider co-morbid or co-existing conditions that may impact functionality.

24.     LINA further agreed to "[m]ake appropriate decisions by providing a thorough, fair and objective evaluation of all claimants."

25.     LINA further agreed that a "Social Security Disability Income ('SSDI') award by the Social Security Administration ('SSA') will be given significant weight in a claimant's favor under certain circumstances in making a Disability analysis. For that reason, where a claimant has been awarded SSDI benefits, the Claim Manager should review the SSA records related to the award and highlight the consideration given to the SSDI award and decision in the claim file documentation."

26.     LINA further agreed that exceptions to giving an SSDI award "significant weight" include where the award "is based on the SSA's use or application of internal administrative standards that may reduce the standard of

proof for certain claimants, e.g. transferability of skills for older claimants, and are inconsistent with the applicable Disability policy's proof requirements for Disability; The SSDI award is aged and/or inconsistent with other information relevant to the Disability determination, including, e.g. more current medical information and/or vocational and financial/earnings information;" where a contractual provisions such as a pre-existing condition exclusion applies to the claimant; or where "records relevant to the timing and/or basis of the SSDI determination are not otherwise available and the claimant has refused to provide and/or timely respond to the Company's reasonable requests for authorization to obtain the SSDI file."

27. LINA further agreed that its "Clinical, Vocational, and Medical Professionals" would abide by a "Statement Regarding Professional Conduct" that requires them, among other things, to: "Discuss medical and/or vocational facts in an open and honest manner"; "Provide fair and reasonable evaluations considering all available medical and/or vocational evidence, both objective and subjective, both supporting impairment and supporting capacity"; "Consider all diagnoses and impairments, and their effect on the whole person, when evaluating medical and/or vocational data in a claim file"; "Represent medical and/or vocational facts accurately"; and "Provide reasonable, clear, and accurate explanations of professional opinions so that clear and full explanations of decisions based on those opinions are available to the claimant."

28. In administering Ms. Smith's claim, LINA violated multiple obligations under the RSA and, in doing so, violated its obligations to handle Ms. Smith's claim fairly and objectively.

## MS. SMITH BECOMES DISABLED AFTER UNDERGOING SPINAL SURGERY A FEW YEARS AFTER SURVIVING A HELICOPTER CRASH

29.     In December, 2004, Ms. Smith (f/k/a Kelly Foster-Stopka) was working as a flight nurse on an air-evac medical transport helicopter when the helicopter crashed. *See* Exhibit 2 hereto.

30.     Following the helicopter crash, Ms. Smith underwent extensive treatment and rehabilitation and was eventually able to return to work.

31.     Nevertheless, Ms. Smith continued to suffer pain in multiple areas, including in her lower back. In 2006 she was diagnosed with a previously-unknown broken sacrum and coccyx.

32.     In 2007, Ms. Smith began undergoing pain management procedures for her pain, including spinal blocks and radio frequency ablations that deliberately destroy nerves in the back to interrupt pain signals.

33.     As the years progressed, Ms. Smith's condition continued to worsen.

34.     In 2009, Ms. Smith was diagnosed with rheumatoid arthritis and fibromyalgia, in addition to her continuing back pain.

35.     After the air-evac company closed its Tucson operation Ms. Smith took a job as a dialysis nurse with Fresenius Medical Care; beginning work in February 2012.

36.     By 2014, Ms. Smith's pain and limitations were so severe that she scheduled spinal surgery for February 2014. Unfortunately, that surgery was postponed due to he having an elevated white blood cell count before the surgery.

37.     However, due to Ms. Smith's ongoing, debilitating pain, she was forced to stop work on February 24, 2014.

38.     Ms. Smith underwent back surgery—a "[l]umbar laminotomy and foraminotomy including partial facetectomy with decompression of the nerve

roots, right L5-S1" and "[d]estruction by thermal ablation of the paravertebral facet joint nerves, bilateral, L3-4, bilateral L4-5, left L5-s1"—on June 27, 2014. Unfortunately, Ms. Smith's spinal surgery failed to totally alleviate her back pain. Moreover, she continued to be plagued by her rheumatoid arthritis and other conditions; all of which rendered her totally disabled.

39.     Being unable to work, Ms. Smith applied for long-term disability (LTD) benefits with LINA in July 2014.

## LINA DENIES MS. SMITH'S LTD CLAIM, SHE APPEALS, LINA APPROVES HER CLAIM, AND LINA DENIES HER CLAIM AGAIN A YEAR LATER

40.     Despite Ms. Smith's physicians' certifying her disability to LINA, the company denied her LTD application in September 2014.

41.     By letter dated September 28, 2014, Ms. Smith sent a short, hand-written appeal to LINA disputing the denial of her LTD benefits.

42.     LINA denied Ms. Smith's appeal by letter dated November 4, 2014.

43.     Ms. Smith then submitted a second appeal as to the LTD and LWOP denials which included the report of a comprehensive Functional Capacity Evaluation (FCE) that confirmed Ms. Smith was "unable to perform the physical demands of her past work as a Registered Nurse or any type of work including SEDENTARY work on a regular and consistent basis" (capitalization in original); medical records from Ms. Smith's attending physicians documenting her ongoing restrictions; records from Ms. Smith's attending rheumatologist certifying her disability and his agreement with the FCE results; and a declaration from Ms. Smith testifying under oath about her medical conditions and resulting restrictions and limitations.

44.     By letter dated June 10, 2015, LINA approved Ms. Smith's LTD benefits under the Plan's "regular occupation" standard.

45.     By letter dated June 12, 2015, LINA upheld its decision denying Ms. Smith's LWOP claim.

46.     Under the LTD plan, Ms. Smith's twenty-four months of "regular occupation" income replacement benefits would end August 24, 2016.

47.     By letter dated June 16, 2016, LINA denied Ms. Smith's claim for LTD benefits beyond August 24, 2016 claiming she "no longer remain[ed] disabled as defined by [her] policy."

48.     In that letter, LINA stated that Ms. Smith was capable of performing two occupations that met the Plan's gainful-earnings threshold: "Coordinator, Volunteer Services" and "Utilization-Review Coordinator."

49.     Because LINA failed to timely provide Ms. Smith with her complete claim file, as she requested, LINA agreed to extend her deadline to appeal the June 16, 2016 decision terminating her LTD benefits to February 13, 2017.

**MS. SMITH APPEALS LINA'S SECOND DENIAL, LINA APPROVES HER CLAIM AND REINSTATES HER BENEFITS UNDER THE PLAN'S "ANY OCCUPATION" STANDARD, MS. SMITH PROVIDES LINA WITH HER SSDI NOTICE OF AWARD, AND LINA ALMOST INSTANTLY CUTS HER OFF AGAIN**

50.     On February 2, 2017, Ms. Smith timely appealed LINA's previous decision terminating her LTD benefits.

51.     With her appeal, Ms. Smith submitted, among other things, the report of a November 8, 2016 FCE re-confirming that "Ms. Smith continues to be functionally limited from performing both her past work as NURSE… or ANY OTHER WORK including SEDENTARY work on a regular and consistent basis" (capitalization in original), and also stating it was "important to note that Ms. Smith gave full physical effort throughout the FCE testing and there were no signs of unusual behavior, performance concerns or symptom exaggeration"; and records from her attending physician documenting that she "continues to

have significant lower back pain," was "struggling with pain" and "has significant decrease in function," and her physical exam showed multiple objectively-verified deficits.

52.   By letter dated April 26, 2017, LINA approved Ms. Smith's claim for ongoing LTD benefits under the "any occupation" standard.

53.   On June 13, 2017, two and a half months after determining based on Ms. Smith's appeal documentation that she was unable to perform any occupation for which she was reasonably qualified, LINA stated in a letter that it had determined that an "Independent Medical Evaluation" (IME) "may help us to make a decision on your claim."

54.   Two weeks later, on June 27, 2017, Ms. Smith supplied LINA with her June 21, 2017 "Notice of Award" of Social Security Disability Insurance (SSDI) benefits. As that Notice of Award showed, the Social Security Administration (SSA) "found that you became disabled under our rules on February 24, 2014."

55.   Under the Social Security statutes, a claimant is only entitled to SSDI benefits if she is unable "to engage in any substantial gainful activity" in the national economy. *See* 42 U.S.C. § 423(d).

56.   The SSDI definition of disability is much stricter than the Plan's "any occupation" definition of disability because, under the LTD plan, Ms. Smith is entitled to benefits if she is unable to perform any occupation for which she is or may become reasonably qualified to perform *and* is "unable to earn 60% or more" of her indexed pre-disability earnings.

57.   By letter dated July 13, 2017, LINA demanded that Ms. Smith repay an "overpayment" that occurred due to her retroactive award of SSDI benefits. LINA's overpayment calculation was grossly erroneous and demanded she repay nearly double what she had been awarded in retroactive benefits.

9

1    58.    On July 20, 2017, Ms. Smith objected to LINA's overpayment

2    calculation and asked the company to re-calculate the amount correctly.

3    59.    Also on July 20, 2017, LINA mailed Ms. Smith a letter terminating

4    her LTD benefits. This was the fourth time LINA denied Ms. Smith's claim and,

5    notably, came less than three months after it approved her any occupation

6    benefits on appeal and less than a month after she provided LINA with her SSDI

7    Notice of Award stating the SSDI found she had been disabled since February

8    2014 under the SSA's more strict definition of disability.

9    60.    In its July 20, 2017 letter, LINA stated "we had an Independent

10   Medical Evaluation set up for 7/11/2017 and notification was sent to your

11   attorney. We were notified that this exam was not attended and did not provide

12   a reasonable excuse…" The letter then stated that its "Nurse Case Manager and

13   our Occupational Medicine Medical Director then performed a complete review

14   of your file to determine what your current medically supported restrictions and

15   limitations were." LINA stated that those employee medical personnel claimed

16   she was "capable of performing frequent sit, stand and walk" and lifting up to 20

17   pounds occasionally.

18   61.    LINA then stated that its vocational department identified two jobs

19   it claimed she was capable of performing: "Coordinator, Volunteer Services" and

20   "Utilization-Review Coordinator"; the same two jobs LINA had said Ms. Smith

21   could perform when it terminated her benefits a year earlier; the same two jobs it

22   acknowledged she was unable to perform when it reinstated her benefits three

23   months earlier; and two jobs the SSA necessarily found she could not perform

24   when it approved her claim one month earlier.

25   62.    LINA's bases for terminating Ms. Smith's benefits in July 2017 were

26   baseless.

27

28

A. Ms. Smith's claim file, which LINA sent to Ms. Smith's counsel on August 8, 2017 and stated was the "complete copy of the information used to render our decision on this claim" does not show that LINA actually referred her claim to an outside vendor for an IME.

   i. When LINA previously referred Ms. Smith's claim to an outside vendor for a medical review in May 2015, it completed a "Vendor Referral Form," copies of which are attached as Exhibit 3.

   ii. When LINA previously referred Ms. Smith's claim to an outside vendor for a medical review in May 2015, its internal claim notes discuss the referral, including noting the company had "[s]ubmitted referral for Occ Med/PR [peer review]," "[v]endor made aware to pick up files for processing," and that LINA thereafter "Rec'd final report."

   iii. Ms. Smith's claim file does not contain any correspondence or other documentation in 2017 showing her claim was referred to an outside vendor to set-up and/or coordinate the IME LINA alleges Ms. Smith failed to attend.

   iv. Ms. Smith's claim file does not contain any correspondence from LINA to Ms. Smith or her counsel notifying them of the allegedly-scheduled July 11, 2017 IME.

   v. Ms. Smith's claim file does not contain any records of telephone calls being made to her or her counsel notifying them of the allegedly-scheduled July 11, 2017 IME.

B. Contrary to LINA's assertion in the July 20, 2017 termination letter, LINA had never notified Ms. Smith's counsel that an IME

had been scheduled for July 11, 2017. *See* Exhibit 4, Declaration of Patrick W. Mause. Specifically, Mr. Mause was never notified by mail, certified mail, phone call, or in any other manner that a July 11, 2017 IME had been scheduled for Ms. Smith. *Id*. at ¶¶ 19-23.

C. Contrary to LINA's assertion in the July 20, 2017 termination letter, its Occupational Medicine Medical Director did not "perform[] a complete review of [her] file." Instead, that LINA employee, Dr. Donald W. Minteer failed to consider Ms. Smith's November 8, 2016 FCE.

D. Moreover, in his review, Dr. Minteer ignored and discounted the contents of Ms. Smith's medical records, including ignoring the findings of one of Ms. Smith's attending physicians on June 12, 2017 that "[t]he past 3 months have been very difficult for her [Ms. Smith]. She is having diffuse joint swelling and pain and this varies at certain times of the day. She has left hip pain for the past 3 months. This interferes with her sleep process."

E. While LINA is required under the RSA to give significant weight to Ms. Smith's fully-favorable SSDI benefits award, Dr. Minteer never considered that award.

F. Instead of performing a "complete review" of Ms. Smith's file, and performing the full and fair review she is entitled to under ERISA, LINA and its employees, including Dr. Minteer, deliberately ignored and discounted information confirming Ms. Smith's ongoing disability, cherry-picked information to support the termination of her benefits, and did so to serve their own and the company's interests in order to maximize the company's

12

1    financial performance and thereby maximize their own potential

2    compensation and/or bonuses in violation of Ms. Smith's rights.

3    63.    LINA's terminating Ms. Smith's LTD benefits is contrary to the plan

4    terms, contrary to the overwhelming medical evidence that Ms. Smith was and

5    remains totally disabled as defined under the LTD and LWOP plans, contrary to

6    and in violation of LINA's obligations under the RSA, and is driven by LINA's

7    and its employees' financial incentive to minimize approved claims.

8    **Ms. Smith's Claim Is Ripe Because The Plan Does Not Mandate That She**

9    **Exhaust Any Administrative Remedies Before Filing Suit**

10    64.    Where an ERISA plan makes an administrative appeal process

11    appear to be "optional," or where the plan does not mandate exhaustion of

12    administrative remedies as a prerequisite to filing suit, a claimant need not

13    exhaust any administrative remedies before filing suit. *Spinedex Physical Therapy*

14    *USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1298-99 (9th Cir. 2014)

15    ("A number of our sister circuits have held that a claimant need not exhaust

16    when the plan does not require it. We arguably adopted the same rule in *Nelson*

17    *v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384 (9th Cir.1994), and we do

18    so explicitly today.").

19    65.    The LTD Plan states: "Whenever a claim is denied, **there is a right to**

20    **appeal** the decision. A written request for appeal must be made to the Insurance

21    Company within 60 days (180 days in the case of any claim for disability

22    benefits) from the date the denial was received. **If a request is not made within**

23    **that time, the right to appeal will have been waived**." (Ex. 1 at Plan p. 27 (Kelly-

24    Smith-0372) (emphasis added)).

25    66.    The LTD Plan does not mandate exhaustion of administrative

26    remedies as a prerequisite to filing suit. Rather, it is a right Ms. Smith possesses

27    but, by the Plan's plain language, may "waive."

28

67.    Alternatively, the Plan language "could reasonably be read as making optional the administrative appeal process" thereby alleviating Ms. Smith of any theoretical obligation to go through the administrative appeal process before filing suit. *Spinedex*, 770 F.3d at 1298.

68.    Ms. Smith's claim is therefore ripe and she may file suit under ERISA, 29 U.S.C. § 1132(a)(1).

69.    Moreover, to the extent Ms. Smith is entitled to equitable relief under 29 U.S.C. § 1132(a)(3), there is no requirement that she exhaust any administrative remedies before bringing suit under that section. *Spinedex*, 770 F.3d at 1294 ("as a general rule, exhaustion is not required for statutory claims like Aragon's [claim for breach of fiduciary duty under ERISA].").

### COUNT ONE: CLAIM BENEFITS UNDER ERISA

70.    Ms. Smith incorporates the preceding allegations as if fully set forth herein.

71.    Ms. Smith was and remains totally disabled as defined under the LTD and LWOP plans.

72.    Ms. Smith has been damaged by LINA's improper decision terminating her LTD and LWOP claims.

73.    The Plan does not grant LINA discretion to determine entitlement to benefits.  Therefore the Court must review LINA's decisions under the *de novo* standard of review.

74.    Under the *de novo* standard or review, LINA's decision was erroneous, contrary to the plan terms, and contrary to the medical evidence. Ms. Smith is entitled to continuing LTD and LWOP benefits under the Plan.

75.    Even under the abuse of discretion standard of review, LINA abused its discretion because its decisions terminating Ms. Smith benefits were arbitrary and capricious and because they were caused or influenced by LINA's,

14

its reviewing physicians', and the Plan's financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

76.    Upon information and belief, the LINA employees involved in Ms. Smith's claim are eligible for bonuses through their employment with LINA.

77.    Upon information and belief, the bonuses of the LINA employees involved in Ms. Smith's claim are based in whole or in part on the company's financial performance.

78.    Upon information and belief, LINA and its employees and consultants who evaluated Ms. Smith's claim suffer from financial conflicts of interest which infected the claim process and which precluded a full and fair review of Ms. Smith's claim.

79.    LINA and the Plan have a parsimonious claims handling history. *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); May 13, 2013 LINA Regulatory Settlement Agreement.

80.    LINA has a long history of improper claim administration.  *Id*.

81.    LINA violated the terms of the Regulatory Settlement Agreement in administering Ms. Smith's claim.

82.    Ms. Smith is entitled to discovery regarding the effects of the procedural irregularities that occurred during the claims handling process and regarding the effects of LINA's, its reviewing physicians', its employees', and the Plan's financial conflicts of interest, biases, and motivations on the decision terminating Ms. Smith's LTD and LWOP claims. Evidence of these conflicts and procedural irregularities include but are not limited to Dr. Minteer's failure to review probative and recent evidence confirming Ms. Smith's ongoing disability such as her November 2016 FCE and the June 2017 SSDI benefit award and his disregarding and discounting other information confirming her ongoing

disability while cherry-picking the record to support his incorrect and biased decision that Ms. Smith did not suffer disabling restrictions and limitations. Further evidence of these conflicts includes the fact that no other LINA employees raised these issues with Dr. Minteer, accepting instead his obviously incomplete and therefore insufficient opinion to justify terminating Ms. Smith's benefits. Further evidence of these conflicts includes LINA's misrepresenting in its July 20, 2017 letter terminating Ms. Smith's ongoing LTD benefits that Dr. Minteer had "performed a complete review of [her] file" and that Ms. Smith had been scheduled for an IME.

83. Pursuant to ERISA, Ms. Smith is entitled to discovery regarding, among other things, the credibility of the medical and vocational personnel LINA relied upon to terminate Ms. Smith's LTD benefits. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007).

84. Pursuant to ERISA, Ms. Smith is entitled to take discovery, introduce evidence, and then establish the effects of LINA's personnel's credibility and biases through a bench trial regarding, among other things, the credibility of the medical and vocational personnel LINA relied upon to terminate Ms. Smith's LTD benefits and the effect of their inherent financial conflicts of interest on their credibility. *See e.g. Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("Instead, without evidentiary hearing or bench trial, the district court considered and rejected Nolan's bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party. Though the district court would have been permitted to weigh such evidence after bench trial, weighing that evidence on summary judgment was improper in this case where the evidence was outside of the administrative record."); *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016) ("As a preliminary matter, we note that Mr.

Demer's argument here is comparable to conventional approaches to discrediting the testimony of retained experts whose objectivity may be challenged based on, *e.g.*, the number of times he or she has served as an expert in support of a party and the amount of compensation received.").

85.   Ms. Smith has been injured and suffered damages in the form of lost LTD and LWOP benefits as a result of LINA's and/or the Plan's wrongful decision to terminate her disability benefits.

86.   Ms. Smith has been further injured and suffered damages by losing other benefits to which she may have been entitled under her employer's ERISA-governed benefits plan.

87.   Pursuant to ERISA, 29 U.S.C. § 1132(a)(1), Ms. Smith is entitled to recover unpaid disability benefits, reinstatement of her LTD and LWOP benefits, prejudgment interest, reasonable attorney's fees and costs, and/or is entitled to an order enforcing her right to disability benefits under the LTD plan and under the LWOP provision of the life insurance plan.

88.   To the extent Ms. Smith may not be entitled to recover unpaid disability benefits and/or reinstatement of her LTD and LWOP benefits, she is entitled to other equitable relief under 29 U.S.C. § 1132(a)(3) because LINA's termination of, and failure to reinstate her benefits constitutes a breach of its fiduciary obligations under ERISA. *Cigna Corp. v. Amara*, 563 U.S. 421 (2011).

WHEREFORE, Plaintiff Kelly Smith prays for judgment as follows:

A.   For long-term disability benefits due under the Plan and/or an order enforcing her right to LTD benefits under the Plan;

B.   For reinstatement of her life insurance waiver of premium claim and/or an order enforcing her right to LWOP benefits under the Plan;

17

1      C.     For any other benefits to which Ms. Smith may be entitled due to her
2                disability;

3      D.     For other equitable relief as may be allowed by law including under
4                29 U.S.C. § 1132(a)(3);

5      E.     For prejudgment interest at the maximum legal interest rate until
6                paid;

7      F.     For attorney's fees and costs incurred as a result of prosecuting this
8                suit pursuant to 29 U.S.C. § 1132(g); and

9      G.     For such other relief as the Court deems just and proper.

DATED this 3rd day of October, 2017.

LAW OFFICE OF PATRICK MAUSE, PLLC

By  _s/_ Patrick W. Mause
      Patrick W. Mause
      Attorney for Plaintiff